**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | § § § | CASE NO: 00-10992 |
| THE BABCOCK & WILCOX COMPANY, | § § § § | CHAPTER 11 SECTION A |
| DEBTOR. | § § | |

| | | |
|---|---|---|
| THE BABCOCK & WILCOX COMPANY, | § § § § | |
| PLAINTIFF, | § § | ADV. NO. 21-1014 |
| V. | § § § | |
| PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC, PES LIQUIDATING TRUST, WESTPORT INSURANCE COMPANY, XL INSURANCE AMERICA, INC., ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, HDI GLOBAL INSURANCE COMPANY, AND CERTAIN UNDERWRITERS AT LLOYD'S LONDON-SYNDICATE 1221 (NAVIGATORS), ZURICH AMERICAN INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO ENNMG1800181, CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO ENNMG1800281, CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO ENNMG1800282, CERTAIN UNDERWRITERS AT LLOYD'S SUBSCRIBING TO EN100070-18, | § § § § § § § § § § § § § § § § § § § § § § § § § | |
| DEFENDANTS. | § § | |

# MEMORANDUM OPINION

The sole count in the above-captioned adversary proceeding filed by The Babcock & Wilcox Company ("B&W") seeks (i) a declaration that the confirmed plan of reorganization in B&W's 2000 bankruptcy case discharged the claims now asserted against B&W entities[1] in a Pennsylvania state court by two of the above-named Defendants, Philadelphia Energy Solutions Refining & Marketing, LLC ("PESRM"), and PES Liquidating Trust and (ii) enforcement of the confirmed plan's discharge injunction. The Pennsylvania state court action asserts products-liability claims against B&W entities stemming from a 2019 explosion at a refinery formerly operated by PESRM that was allegedly caused by the failure of an elbow joint manufactured by B&W and installed in the refinery in the 1970s. [ECF Doc. 34, ¶¶ 29–31 & Ex. A, ¶¶ 15 & 17].

Before the Court are cross-motions for summary judgment filed by B&W, [ECF Docs. 138 & 168],[2] and the above-named Defendants, [ECF Docs. 82 & 161]. Both motions are opposed. [ECF Docs. 136 & 161]. The parties have submitted statements and counterstatements of material facts. [ECF Docs. 82-1, 137, 160 & 162]. For the reasons below, the Court **DENIES** both motions for summary judgment.

---

[1] According to the Amended Complaint filed by B&W in the above-captioned adversary proceeding:

> On February 26, 2021, PES filed the State Court Complaint in the Court of Common Pleas of Philadelphia, asserting claims of negligence, strict liability, and breach of implied warranties, against B&W, Babcock & Wilcox Holdings, LLC, and Babcock & Wilcox Enterprises, Inc. Babcock & Wilcox Holdings, LLC and Babcock & Wilcox Enterprises, Inc. . . . were not formed and did not come into existence until 2015.

[ECF Doc. 34, ¶ 28]. B&W also noted that "PES . . . incorrectly designated Babcock & Wilcox Company as a defendant. There is no legal entity with the name of Babcock & Wilcox Company." [ECF Doc. 34, n.3].

[2] On October 24, 2023, the following entities were allowed to intervene as plaintiffs in this adversary proceeding: (i) Westchester Fire Insurance Company; (ii) Ace Property & Casualty Insurance Company; (iii) Indian Harbor Insurance Company; (iv) Starr Surplus Lines Insurance Company; and (v) The Members of Lloyd's Syndicate 1861 as constituted for the 2019 underwriting year of account acting through their managing agent Canopius Managing Agents Limited (collectively, the "Reorganized B&W Insurers"). The Reorganized B&W Insurers have not joined or filed a motion for summary judgment.

**JURISDICTION AND VENUE**

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The confirmed plan of reorganization in B&W's bankruptcy case also reserved to this Court post-confirmation jurisdiction to resolve matters including, but not limited to, "all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan Documents or their interpretation, implementation, enforcement, or consummation." [No. 00-10992, ECF Doc. 7003, § 9.5.3].

The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**DISCUSSION**

The parties agree upon or do not dispute the following facts:

**A.     The Girard Point Refinery's Construction and Ownership (1970 to Date)**

In the early 1970s, Gulf Oil Company ("Gulf Oil") entered Contract 14-1070 (the "Contract") with Foster Wheeler Corporation ("FWC") for the construction of the HF Alkylation Unit No. 433 ("Unit 433") at the Girard Point Refinery (the "GP Refinery"), part of an oil refining complex owned by Gulf Oil in Philadelphia, Pennsylvania. [ECF Docs. 82-1, ¶ 1, Ex. A, ¶ 3 & Ex. A-2, PESP000360, PESP000390, PESP000420, PESP000718, PESP000971, PESP001125, PESP001136; ECF Doc. 137, at 2].

During the construction of Unit 433, FWC, as general contractor, sourced materials, including piping used in fabricated piping systems and fittings or "elbow joints," from a variety of vendors, subcontractors, and fabricators. [ECF Doc. 82-1, ¶ 2; ECF Doc. 137, at 3]. FWC sourced

3

both carbon-steel and YOLOY[3] alloy-steel elbow joints for use in the GP Refinery, depending on the specific application (*i.e.*, how an elbow joint was to be used). [ECF Doc. 137, at 14; ECF Doc. 160, at 3–4]. The Contract required carbon-steel elbow joints. [ECF Doc. 82-1, ¶ 4 & Ex. A, ¶ 4, Ex. A-2, Bates PESP000718; ECF Doc. 137, at 3]. FWC utilized a number of vendors, subcontractors, and fabricators to procure and fabricate materials for the construction of Unit 433. [ECF Doc. 82-1, ¶ 7 & Ex. A, ¶ 5, Ex. A-2, Bates PESP000971, PESP001125, PESP001136 & PESP001189–90; ECF Doc. 137, at 5]. A YOLOY alloy-steel elbow joint was installed in Unit 433. [ECF Doc. 82-1 & Ex. A, ¶ 5; ECF Doc. 137, at 4–5]. For purposes of resolving the cross-motions for summary judgment here, no party contests the allegations made by PESRM and PES Liquidating Trust in the Pennsylvania state court action that an explosion occurred in June 2019 at the GP Refinery as a result of a failed elbow joint installed in Unit 433. The record before the Court indicates that B&W does not contest the allegation that B&W manufactured and supplied the elbow joint that failed. [ECF Doc. 82-1 & Ex. A, ¶ 5; ECF Doc. 137, at 4–5].

In the early 1980s, Gulf Oil merged with Chevron Corporation ("<u>Chevron</u>"), and in 1994, Chevron sold the GP Refinery to Sunoco, Inc. ("<u>Sunoco</u>"). [ECF Doc. 82-1, ¶ 8; ECF Doc. 137, at 6]. Sunoco remained the sole owner of the GP Refinery until June 2012, when it formed Philadelphia Solutions, LLC ("<u>PES LLC</u>") with a private equity fund and a co-investment fund and contributed the GP Refinery to PES LLC, which operated the GP Refinery through its wholly owned subsidiary, PESRM, formed for that purpose. [ECF Doc. 137, at 21; ECF Doc. 160, at 12].[4] On August 14, 2012, Sunoco (n/k/a Sunoco (R&M), LLC), the Commonwealth of

---

[3] YOLOY is a high-strength, low-alloy, nickel-copper steel. [ECF Docs. 137, at 15 & 160, at 8].

[4] Initially, Sunoco held a 49% interest in PES LLC, but that stake has been reduced over time. [ECF Doc. 160, at 12].

4

Pennsylvania Department of Environmental Protection, and PESRM entered into a Consent Order and Agreement that transferred the GP Refinery to PESRM. [ECF Doc. 160, at 13].

### B. B&W's Bankruptcy Case and Confirmed Plan of Reorganization

On February 22, 2000, B&W filed a chapter 11 bankruptcy petition in this Court. [No. 00-10992, ECF Doc. 1].[5] At that time, B&W and its subsidiaries were "leading suppliers of fossil fuel fired steam generating systems, replacement commercial nuclear steam generators, environment equipment and related components and services to its customers around the world." [No. 00-10992, ECF Doc. 3147, § VII.A]. B&W and its affiliates filed petitions for chapter 11 bankruptcy relief primarily to deal with asbestos-related personal-liability claims. [No. 00-10992, ECF Doc. 6913, § II.A].

Sunoco received notice of B&W's bankruptcy filing and filed a proof of claim against the estate. [ECF Doc. 137, at 22–24; ECF Doc. 160, at 14]; [No. 00-10992, ECF Docs. 5227 & 6462]. Sunoco's proof of claim asserted a claim related to another facility, not the GP Refinery. [ECF

---

[5] B&W's bankruptcy case was jointly administered with cases filed by subsidiaries Diamond Power International, Inc. (No. 00-10993), Babcock & Wilcox Construction Co., Inc. (No. 00-10994), and Americon, Inc. (No. 00-10995). [No. 00-10992, ECF Doc. 4]. The history of B&W extended back to 1856:

> In 1856, Stephen Wilcox patented a water tube boiler that allowed better water circulation and, most notably, was inherently safe. Eleven years later, he and George Babcock established Babcock, Wilcox and Company, which manufactured and marketed water tube steam boilers. In 1881, the Babcock & Wilcox partnership was incorporated as The Babcock & Wilcox Company ("B&W"). In 1978, J. Ray McDermott & Co., Inc. acquired B&W. J. Ray McDermott & Co., Inc. became McDermott Incorporated in 1980 ("MI") and, in 1983, McDermott International, Inc. ("MII") became the parent company of MI. B&W is an indirect subsidiary of MII in that B&W is a wholly-owned subsidiary of Babcock & Wilcox Investment Company ("BWICO") which in turn is wholly-owned by MI, which in turn is wholly-owned by MII. MII is a Panamanian corporation which is publicly traded on the New York Stock Exchange.
>
> Diamond Power International, Inc. ("DPII"), incorporated in 1997, is a wholly-owned subsidiary of B&W. Americon, Inc. ("Americon"), incorporated in 1985, is also a wholly-owned subsidiary of B&W. It has no operations and is in essence a holding company for Babcock & Wilcox Construction Co., Inc. ("BWCC").

[No. 00-10992, ECF Doc. 3147, § VII.A].

Doc. 137, at 23; ECF Doc. 160, at 14]. Gulf Oil and Chevron also received notice of B&W's bankruptcy filing. [ECF Doc. 137, at 2–24; ECF Doc. 160, at 15]; [No. 00-10992, ECF Docs. 5227 & 6462].

On May 15, 2002, this Court entered an Order denying B&W's motion to extend the exclusive period within which to gain acceptances to a plan of reorganization. [No. 00-10992, ECF Doc. 3173]. Ultimately, on December 22, 2005, after prolonged litigation and mediation, B&W and the other jointly administered debtors, the official Asbestos Claimants' Committee, the Court-appointed Future Asbestos-Related Claimants' Representative, and B&W's parent company, McDermott International, Inc., filed a *Joint Plan of Reorganization as of September 28, 2005, as Amended Through November 10, 2005 (with Technical Modifications Through December 22, 2005)* (the "Joint Plan"). [No. 00-10992, ECF Doc. 7003]. The District Court confirmed the Joint Plan on January 17, 2006, [No. 00-10992, ECF Doc. 7053], and the Joint Plan became effective on February 22, 2006, [No. 00-10992, ECF Doc. 7134].

The Joint Plan created the Asbestos PI Trust, funded with assets of B&W, its debtor-affiliates, as well as certain non-debtor affiliates; under the Joint Plan, the Asbestos PI Trust would be the sole recourse for payment of current and future asbestos-related claims against B&W. [No. 00-10992, ECF Doc. 6913, § II.B].[6] All other non-asbestos-related claims, including Class 5

---

[6] Three main sources funded the Asbestos PI Trust:
- Assignment of the rights to insurance proceeds shared by B&W and its non-debtor corporate parent and affiliates, in the face amount of at least $1.6 billion;
- Transfer of the capital stock of B&W, which was valued at between $400 and $500 million; and
- Additional contributions from certain of B&W's parent companies, MI and MII, including 4.75 million shares of MII common stock with a minimum share price guaranty (valued at $123.1 million), $92 million aggregate principal amount of promissory notes, and certain tax benefits.

[No. 00-10992, ECF Doc. 6913, §§ II.B & III.B; 7003, §§ 1.1.44, 1.1.57, 1.1.92, 3.2.6 & 7.2].

General Unsecured Claims, would be resolved directly by the Reorganized Debtors—in other words, those claims would be paid *pro rata* as directed in the Plan by proceeds generated by the Reorganized B&W's continuing operations. [No. 00-10992, ECF Doc. 6913, §§ II.B & III.B; ECF Doc. 7003, § 3.2].

With few exceptions not pertinent here, the Joint Plan discharges all prepetition claims against the Reorganized B&W and constitutes a permanent statutory injunction prohibiting creditors from asserting those claims going forward:

> Except as otherwise provided in this Plan, the rights afforded in this Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the Debtors, or any conduct for which any of the Debtors may be deemed to have strict liability under any applicable law) shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except (1) those expressly assumed by the Reorganized Debtors pursuant to this Plan and (2) those claims that pass through this Plan unimpaired pursuant to Section 3.2.8 herein. **All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, the Asbestos Protected Parties, Settling Asbestos Insurance Entities, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date**, except as expressly provided in this Plan.

[No. 00-10992, ECF Doc. 7003, § 11.2 (emphasis added)].[7]

---

[7] Section 3.2.8 of the Joint Plan dealt with a class of prepetition claims against B&W arising out of the alleged presence of or exposure to nuclear contamination in two communities in Pennsylvania not implicated in this dispute.

### C. The Pennsylvania State Court Action and Adversary Proceeding

On February 26, 2021, PESRM and PES Liquidating Trust (together with PESRM, the "PES Entities") filed a lawsuit in a Pennsylvania state court against B&W alleging negligence and products liability claims associated with the June 2019 explosion at the GP Refinery. [ECF Doc. 34, Ex. A]. On April 28, 2021, B&W obtained leave of Court to reopen B&W's bankruptcy case and filed the above-captioned adversary proceeding in this Court, seeking a declaratory judgment that the claims alleged by the PES Entities in the Pennsylvania state court action were discharged by the Joint Plan confirmed during B&W's prior bankruptcy and to enforce the Joint Plan's discharge injunction. [ECF Doc. 1 & No. 00-10992, ECF Doc. 7865]. As a result, the proceedings in the Pennsylvania state court action are stayed.

The parties engaged in extensive discovery and filed the cross-motions for summary judgment.

### DISCUSSION

#### A. Summary Judgment Standard

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment at trial. FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A court views the facts and evidence in the light most favorable to the nonmovant. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). If the movant fails to show an absence of a genuine issue of material fact, a court shall deny the movant's motion. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the movant succeeds, the

nonmovant must go beyond the pleadings and designate facts that show a genuine issue. FED. R. CIV. P. 56(c)(1). "When parties file cross-motions for summary judgment, [courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotations and citation omitted).

> **B.** **The PES Entities Will Be Bound by the Terms of the Joint Plan as Joint Venturers/Successors-in-Interest to the GP Refinery If the Claims Asserted Against B&W in the Pennsylvania State Court Action Are Prepetition Claims That Were Discharged by the Confirmation of the Joint Plan.**

As an initial matter, the PES Entities assert that they cannot be bound by the terms of the confirmed Joint Plan—specifically the release language discharging all non-asbestos-related prepetition claims—as PESRM "was formed and acquired the GP Refinery in 2012, twelve years after B&W filed for bankruptcy and six years after B&W's Joint Plan . . . was confirmed," and thus could not have had any prepetition relationship with B&W. [ECF Doc. 82, ¶ 12]. PES further asserts that "any alleged pre-petition relationship between Gulf Oil, Chevron, or Sunoco and B&W could not be imputed to [the PES Entities]." [ECF Doc. 82, ¶ 13].

This Court disagrees.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "[A] bankruptcy order is entitled to the effect of *res judicata*." *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1051 (5th Cir. 1987) (citing *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir. 1984)). Under the Fifth Circuit's four-prong test for application of *res judicata*, "the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits and the same cause of action must be involved in both cases." *Nilsen v.*

*City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (en banc). Once those four elements are met, this Court must also determine whether "the previously unlitigated claim could or should have been brought in the earlier litigation." *D–1 Enters., Inc. v. Commercial State Bank*, 864 F.2d 36, 38 (5th Cir. 1989); *see also In re Intelogic Trace, Inc.*, 200 F.3d 382, 388 (5th Cir. 2000); *In re Howe*, 913 F.2d 1138, 1145 (5th Cir. 1990).

The parties do not dispute that this Court held competent jurisdiction over B&W's bankruptcy proceeding or that the Order confirming the Joint Plan constituted a final judgment on the merits. As to the first factor requiring the parties to be "identical in both suits," the Fifth Circuit does not require strict identity of parties for *res judicata* purposes. *See Clifton v. Warnaco, Inc.*, Nos. 94-10226 & 94-10657, 1995 WL 295863, at *6 (5th Cir. Apr. 18, 1995). The preclusive effect of the *res judicata* doctrine can be extended to persons or entities "in privity" with parties to the litigation, which "is merely another way of saying that there is sufficient identity between parties to prior and subsequent suits for res judicata to apply." *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990). Indeed, "[p]rivity is recognized as a broad concept, which requires [a] look at the surrounding circumstances to determine whether claim preclusion is justified." *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1173 (5th Cir. 1992). The Fifth Circuit recognizes privity in three circumstances: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Meza*, 908 F.2d at 1266.

Here, Gulf Oil contracted for the construction of the GP Refinery in the early 1970s. In the early 1980s, Gulf Oil merged with Chevron, and, in 1994, Chevron sold the GP Refinery to Sunoco. [ECF Doc. 82-1, ¶ 8; ECF Doc. 137, at 6]. B&W filed for chapter 11 bankruptcy relief

in February 2000. Sunoco remained the sole owner of the GP Refinery until June 2012, when it formed PES LLC with a private equity fund and a co-investment fund and contributed the GP Refinery to PES LLC. PES LLC, in turn, operated the GP Refinery through its wholly owned subsidiary, PESRM, formed for that purpose. [ECF Doc. 137, at 21; ECF Doc. 160, at 12]. On August 14, 2012, Sunoco (n/k/a Sunoco (R&M), LLC), the Commonwealth of Pennsylvania Department of Environmental Protection, and PESRM entered into a Consent Order and Agreement that transferred the GP Refinery to PESRM. [ECF Doc. 160, at 13]. Although Sunoco initially held a 49% interest in PES LLC and that stake has been reduced over time, [ECF Doc. 160, at 12], Sunoco has been a member of PES LLC, whose wholly owned subsidiary, PESRM owns the GP Refinery. Based on those uncontested facts, the Court thus finds that the PES Entities are joint venturers with or successors in interest to Sunoco's interest in the GP Refinery and that Sunoco, having received notice of B&W's bankruptcy and participated in that proceeding, was in a position to adequately represent the PES Entities' interest in the B&W bankruptcy. Thus, the Court finds there to be sufficient identity between Sunoco and the PES Entities to justify the application of *res judicata* here.

The real question, then, is whether the "same cause of action [is] involved in both cases"— that is, whether the claims alleged by the PES Entities against B&W in the Pennsylvania state court action are prepetition claims that were discharged by the Order confirming the Joint Plan in B&W's bankruptcy case.

    **C.**    **A Genuine Issue of Material Fact Exists as to Whether Any Injury Related to the Failed Elbow Joint Manufactured by B&W Was Relatively Certain To Manifest at Some Point.**

"Claim" is defined broadly in the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed,

11

undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). The Bankruptcy Code provides that confirmation of a plan of reorganization discharges a debtor from any debt or claim that arose before the date of such confirmation. 11 U.S.C. § 1141(d)(1)(A). The first step when analyzing whether a claim was discharged by an Order confirming a plan of reorganization is to determine whether the claim is a prepetition bankruptcy claim. *See In re United Ref. Co.*, No. 83-03935, 2021 WL 160433, at *2 (Bankr. S.D. Tex. Jan. 16, 2021), *aff'd and remanded sub nom. United Ref. Co. v. Dorrion*, 688 F. Supp. 3d 558 (S.D. Tex. Aug. 23, 2023).[8]

The definition of "claim" is broad enough to encompass future claims—that is, claims "that have not manifested" at the time of confirmation of a plan of reorganization, "but that are relatively certain to manifest in the future and are based on the prior acts of the debtor." *Fairchild Aircraft Inc. v. Campbell (In re Fairchild Aircraft Corp.)*, 220 B.R. 909, 916 (Bankr. W.D. Tex. 1998) (quoting NAT'L BANKR. REV. COMM'N, TREATMENT OF MASS FUTURE CLAIMS IN BANKRUPTCY (1997)); *see also Dorrion*, 688 F. Supp. 3d at 564.[9] Treating unknown future claims in chapter 11 implicates two competing concerns: "the Bankruptcy Code's goal of providing a debtor with a

---

[8] Courts use 'pre-petition claim' and 'pre-confirmation claim' interchangeably. *See, e.g.*, *In re AMPAM Power Plumbing, L.P.*, 520 B.R. 553, 558 (Bankr. W.D. Tex. 2014) ("As *Wright* instructs, pre-petition and pre-confirmation claims are treated identically in the context of future claims." (citing *Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012))).

[9] "Indeed, the legislative history [of § 101(5)] unmistakably states that the language employed was chosen so that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case [to] permit[] *the broadest possible relief* in the bankruptcy court.'" *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 924 (Bankr. W.D. Tex. 1995), v*acated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998) (quoting H.R. REP. No. 595, 95th Cong., 1st Sess. 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6266). A contingent claim is a type of future claim. Although the Bankruptcy Code does not define a contingent claim, the Fifth Circuit instructs:

> A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created.

*In re All Media Props., Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981).

fresh start by resolving all claims arising from the debtor's conduct prior to its emergence from bankruptcy; and the rights of individuals who may be damaged by that conduct but are unaware of the potential harm at the time of the debtor's bankruptcy." *Wright v. Owens Corning*, 679 F.3d 101, 105 (3d Cir. 2012). Against that backdrop, courts have developed various tests for determining whether future tort claims meet the definition of "claim" under the Bankruptcy Code.[10] Acknowledging that "there must be evidence that would permit the debtor to identify, during the course of the bankruptcy proceedings, potential victims and thereby permit notice to these potential victims of the pendency of the proceedings," the Fifth Circuit has applied a "prepetition-relationship" test to determine whether a future prepetition claim exists. *Lemelle v. Universal Mfg. Grp.*, 18 F.3d 1268, 1277 (5th Cir. 1994) (citations omitted). That test requires "some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant." *Id*. (quoting *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla. 1994)).

Cases applying the prepetition-relationship test are instructive to the Court's determination here. Compare the *Lemelle* and *Piper Aircraft* cases with the *Dorrion* case. In *Lemelle*,

> [t]wo children had died in 1985 after a mobile home manufactured in 1970 by a predecessor of defendant Universal Manufacturing caught fire. The mother of the children brought a wrongful-death suit related to the fire. Universal Manufacturing then sought summary judgment on account of a 1982 bankruptcy filing by the predecessor corporation, arguing that the mother's claim was discharged in bankruptcy. The Fifth Circuit determined that a dischargeable claim didn't exist at the time of filing in part because "the injury and the manifestation of that injury occurred simultaneously," several years after the bankruptcy petition was filed. It

---

[10] Tests include (i) the "accrual" test, (ii) the "fair-contemplation" test, (iii) the "conduct" test, and (iv) the "prepetition-relationship" test. "Under *the accrual test*, a claim accrues for bankruptcy purposes when it accrues under applicable non-bankruptcy law." *Dorrion*, 688 F. Supp. 3d at 563. "Under *the fair-contemplation test*, for a claim to qualify as a prepetition claim, it must have been within the "fair contemplation" of the parties at the time of bankruptcy filing." *Id*. "Under *the conduct test*, a bankruptcy claim arises whenever the conduct prompting alleged liability occurs, even if injury doesn't manifest itself until after the bankruptcy filing." *Id*. The prepetition relationship test applied by the Fifth Circuit is essentially a narrower version of the conduct test. *See id*. at 564.

13

> further explained that there was no evidence indicating "when [the mother] and her family acquired th[e] mobile home or from whom they acquired it." Nor was there any evidence that the manufacturer "should have even known of [the mother's] and her family's existence." They were "completely unknown and unidentified" when the bankruptcy petition was filed.

*Dorrion*, 688 F. Supp. 3d at 564 (summarizing the facts and holding in *Lemelle*, 18 F.3d, at 1271–77). The *Lemelle* court concluded that "even the broad definition of 'claim' cannot be extended to include . . . claimants whom the record indicates were completely unknown and unidentifiable at the time [debtor] filed its petition and whose rights depended entirely on the fortuity of future occurrences." 18 F.3d at 1277. Similarly, the *Piper Aircraft* debtor entered chapter 11 and,

> [a]ssuming that aircraft designed and manufactured by Piper pre-petition would crash and injure persons and property post-petition, a legal representative filed a proof of claim on behalf of potential future claimants for $100 million . . . based on statistical assumptions regarding the number of people who were likely to suffer personal injury or property damage after Piper's reorganization plan was confirmed.

*Lemelle*, 18 F.3d at 1276 (summarizing the facts in *Piper Aircraft Corp.*, 162 B.R. at 621–22). In finding that the future claimants had no bankruptcy claim that could be affected by an Order confirming Piper Aircraft's reorganization plan, the *Piper Aircraft* court observed:

> We know that some planes in the existing fleet of Piper Aircraft will crash, and we know that there may be injuries, deaths and property damage as a result. We also know that under theories of negligence and products liability, Piper, if it remains in existence, would be liable for some of these damages. Even so, there is no way to identify who the victims will be or to identify any particular prepetition contact, exposure, impact, privity or other relationship between Piper and these potential claimants that will give rise to these future damages.

162 B.R. at 627.

Those cases tell us that, to find a future claim to be a dischargeable prepetition bankruptcy claim under the prepetition-relationship test, two conditions must exist: (1) the future injury must be relatively certain to manifest itself at some point and be attributable to the debtor and (2) the debtor must be able to identify the claimant to whom it can give notice sufficient to satisfy due

14

process that his or her future claim might be discharged by a confirmation order. The holding in *Dorrion* demonstrates this. In affirming the bankruptcy court's finding that the confirmation order discharged a future claimant's claim, the district court recounted evidence that the debtor knew of both its asbestos-related liability and how to identify potential future claimants:

> The Decedent was employed by United Refining [the debtor] at one of its plants in the 1960s. He was exposed to asbestos during such employment. Even the Executor recognizes that United Refining was no doubt aware of the dangers of asbestos exposure by the time of its 1983 bankruptcy filing, with asbestos-related lawsuits against it and many others having been well underway by then. By virtue of his employment, then, the Decedent was neither unknown nor unidentifiable. And the conduct at issue—exposure to asbestos by United Refining—occurred prepetition. The Executor's claim thus existed prepetition, even though the Decedent's injury manifested itself post-petition.
>
> . . . .
>
> On the available record, the bankruptcy court didn't err by determining that the Decedent's estate had sufficient notice of the need to file a bankruptcy claim.

*Dorrion*, 688 F. Supp. 2d at 564 & 566.

In the present case, B&W provided actual notice of its bankruptcy case to Sunoco, the owner of the GP Refinery that housed the elbow joint that ultimately failed. Sunoco participated in B&W's bankruptcy case and filed a proof of claim against the estate. As discussed above, the PES Entities share sufficient identity with Sunoco to be bound by the terms of the Joint Plan if the Pennsylvania state action claims are indeed prepetition claims that have been discharged through confirmation of the Joint Plan. But the competent and undisputed summary judgment evidence is inadequate to reveal whether any injury related to the failed elbow joint manufactured by B&W was relatively certain to manifest at some point. In other words, are the products-liability claims related to the failed elbow joint more like the claims in *Dorrion* and *Piper Aircraft* where the nature and scope of those injuries was known or foreseeable to B&W—or are they more akin to the claim in *Lemelle* where "the injury and the manifestation of that injury occurred

15

simultaneously" years after the bankruptcy case was filed? Without that evidence, this Court is unable to determine under the prepetition-relationship test whether the claims alleged in the Pennsylvania state court action are prepetition bankruptcy claims.

> D. **The Order Confirming the Joint Plan Discharged All Prepetition Bankruptcy Claims Related to the GP Refinery.**

Assuming that the PES Entities' claims alleged in the Pennsylvania state court action **are** prepetition bankruptcy claims, they were discharged by the Order confirming the Joint Plan. The Joint Plan's definition of "Claim" tracks with the broad definition found in § 101(5) of the Bankruptcy Code:

> [A] right to: (a) payment from any of the Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

[No. 00-10992, ECF Doc. 7003, § 1.1.51]. The Joint Plan contemplated, classified, and treated general unsecured non-asbestos-related claims in Class 5. Sunoco received actual notice of B&W's bankruptcy case; as discussed above, that notice can be imputed to the PES Entities as Sunoco's joint venturers/successors-in-interest to the GP Refinery. The Joint Plan contains a sweeping discharge of all prepetition Claims against the Reorganized B&W and constitutes a permanent statutory injunction prohibiting creditors from asserting those claims going forward:

> Except as otherwise provided in this Plan, the rights afforded in this Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or their assets, properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession (including any based on acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton

16

misconduct of any of the Debtors, or any conduct for which any of the Debtors may be deemed to have strict liability under any applicable law) shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except (1) those expressly assumed by the Reorganized Debtors pursuant to this Plan and (2) those claims that pass through this Plan unimpaired pursuant to Section 3.2.8 herein. **All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, the Asbestos Protected Parties, Settling Asbestos Insurance Entities, or their assets, properties, or interests in property any other or further Claims or Demands based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date**, except as expressly provided in this Plan.

[No. 00-10992, ECF Doc. 7003, § 11.2 (emphasis added)].

The PES Entities assert that the PES Entities' claims in the Pennsylvania state court action could not have been discharged because the Joint Plan did not provide for a future-claims representative or trust for non-asbestos future claims. [ECF Doc. 82, ¶¶ 24–28 (citing *In re Fairchild Aircraft Corp.*, 184 B.R. 910 (Bankr. W.D. Tex. 1995), *vacated on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998))]. Although appointing a future-claims representative often satisfies due process requirements for future claimants, the use of a future-claims representative or establishment of a future-claims trust is not required to do so. *See, e.g.*, *In re United Ref. Co.*, No. 83-03935, 2021 WL 160433, at *7 (Bankr. S.D. Tex. Jan. 16, 2021), *aff'd and remanded sub nom. United Ref. Co. v. Dorrion*, 688 F. Supp. 3d 558 (S.D. Tex. 2023) ("[T]he lack of a dedicated trust for future claimants in the Plan does not mean United Refining did not consider future environmental claims."). Indeed, the *Fairchild Aircraft* court itself observed that appointing a "legal representative" is but "one device for assuring fundamental fairness for future claimants," and recognized that "[i]t may not be the only way, of course." 184 B.R. at 931. "Each case will turn on its own facts." *Id*.

The *Fairchild Aircraft* court applied *Lemelle*'s prepetition-relationship test to determine whether certain future claims were prepetition bankruptcy claims that had been discharged by the confirmation of the debtor's plan of reorganization. *See id*. at 931–32. Based on the undisputed facts before it, the court concluded that, although the post-petition injuries resulted from the prepetition conduct of the debtor, the debtor did not take steps to identify the claimants to whom it could give notice sufficient to satisfy due process that their future claims might be discharged by a confirmation order. *See id*. at 932–33. Notice, however, is not the issue in the matter before this Court. As stated above, genuine issues of material fact exist as to whether any injury related to the failed elbow joint manufactured by B&W was relatively certain to manifest at some point such that the claims asserted in the Pennsylvania state court action would constitute prepetition claims that were discharged by the confirmation of the Joint Plan in B&W's 2000 bankruptcy case.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that both motions for summary judgment are **DENIED**.

**IT IS FURTHER ORDERED** that the Court will issue a separate Order setting a scheduling conference to set trial dates in the above-captioned adversary proceeding.

New Orleans, Louisiana, July 2, 2024.

                                            MEREDITH S. GRABILL
                                    UNITED STATES BANKRUPTCY JUDGE